Case 5:23-cv-00045-EKD-JCH   Document 21   Filed 08/30/24   Page 1 of 18
Pageid#: 1893

CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

August 30, 2024
LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| KATIE S., ) | |
|     Plaintiff, ) | Civil Action No. 5:23-cv-00045 |
| ) | |
| v. ) | REPORT & RECOMMENDATION |
| ) | |
| MARTIN O'MALLEY, ) | By:   Joel C. Hoppe |
| Commissioner of Social Security, ) |         United States Magistrate Judge |
|     Defendant. ) | |

Plaintiff Katie S. asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record ("R."), ECF No. 8; the parties' briefs, ECF Nos. 12, 19, 20; and the applicable law, I find that the Commissioner's final decision is supported by substantial evidence. Accordingly, I respectfully recommend that the presiding District Judge affirm the decision.

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th

Cir. 2017); 20 C.F.R. § 404.1520(a)(4).[1] The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

This is Katie's second application for disability benefits. *See* R. 87. In January 2018, Katie filed for benefits alleging that she had been disabled since October 2017 because of obesity, chronic anemia with chronic vaginal bleeding and chronic pain, and anxiety with agoraphobia, among other impairments. *See* R. 64, 67. On September 5, 2019, ALJ Harry Chambers issued a written decision finding that, notwithstanding her severe chronic medical impairments, Katie still could perform certain unskilled occupations existing in the national economy. *See* R. 68–69, 73–74. ALJ Chambers's decision is the final decision of the Commissioner that Katie was "not disabled" on or before September 5, 2019. *See* R. 88; 20 C.F.R. § 404.955.

In August 2020, Katie filed for DIB again, alleging she had been disabled since September 6, 2019, *see* R. 235–37, because of depression, a learning disability, diabetes, an anxiety disorder, degenerative disc disease, a back problem, sciatica, thyroid disorder, polycystic ovarian syndrome ("PCOS"), and chronic pain syndrome, *see* R. 87. She was thirty-one years old in September 2019, *id.*, making her a "younger person" under the regulations, 20 C.F.R. § 404.1563(c). Virginia Disability Determination Services ("DDS") denied her claim initially in July 2021, R. 86–97, and upon reconsideration in December 2021, R. 98–107. On December 6,

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the Commissioner's final written decision.

3

2022, Katie appeared with counsel and testified at a hearing before ALJ Brian Rippel. R. 42–54. A vocational expert ("VE") also testified at the hearing. R. 54–60.

ALJ Rippel issued an unfavorable decision on December 28, 2022. R. 18–34. At step one, he found that Katie had not engaged in substantial gainful activity since September 6, 2019, and that she met the Act's insured-status requirements through September 30, 2021.[2] R. 20. At step two, he found that Katie had "severe" medically determinable impairments ("MDIs") of "lumbar spine degenerative disc disease (DDD); morbid obesity; respiratory impairments (obstructive sleep apnea (OSA) and seasonal allergies); depressive disorder; and anxiety disorder with mixed obsessional symptoms." *Id.* All other impairments, including her history of PCOS "with semi-stable pain symptoms," were non-severe. R. 21. At step three, he concluded that Katie's severe MDIs did not meet or medically equal the relevant Listings. R. 21–25 (citing 20 C.F.R. pt. 404, subpt. P., app. 1 §§ 1.15, 1.16, 3.02, 3.03, 12.04, 12.06).

Next, ALJ Rippel determined that Katie had the residual functional capacity ("RFC") to do "light work," specifically including "lifting and/or carrying up to 20 pounds occasionally and 10 pounds frequently; standing and/or walking up to 6 hours" in an 8-hour workday; and "sitting up to 6 hours in an 8-hour workday." R. 25 (citing 20 C.F.R. § 404.1567(b)); *accord* R. 30–32. Katie was further limited to:

> only occasional climbing ramps or stairs, stooping, kneeling, crouching, crawling, and balancing . . . ; no climbing ladders, ropes, or scaffolds; and occasional exposure to cold or heat extremes, vibration, respiratory irritants (such as fumes,

---

[2] The latter date is called the date last insured, or "DLI." R. 87; *see Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012). To qualify for DIB, Katie must prove that she was "disabled" on or before her DLI. *Johnson*, 434 F.3d at 655–56. Thus, the relevant period in this case is September 6, 2019, through September 30, 2021. R. 20, 34; *see Tolbert v. Colvin*, No. 1:15cv437, 2016 WL 6956629, at *1 (M.D.N.C. Nov. 28, 2016). Nonetheless, ALJ Rippel was required to consider all of the relevant evidence in the record, including ALJ Chambers's prior administrative findings and any evidence created after Katie's DLI that offered some insight into her medical condition during the relevant time. *See Bird*, 699 F.3d at 341–42; *Parker v. Berryhill*, 733 F. App'x 684, 697 (4th Cir. 2018) (per curiam); *Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 477–78 (4th Cir. 1999).

4

odors, dust, gases, poorly ventilated areas in concentrations higher than found in a typical household), or workplace hazards (including unprotected heights and dangerous machinery). She was limited to jobs that require understanding, remembering, and carrying out simple instructions and using judgment to make simple work-related decisions; she could not perform work requiring a specific production rate such as assembly line work or work that requires hourly quotas; and she was limited to only occasional interaction with the public, coworkers, and/or supervisors.

R. 25. This RFC precluded Katie from returning to her past relevant work as a box labeler. R. 32 (citing R. 55–56). Based on the VE's testimony, the ALJ found that a hypothetical worker with this RFC and Katie's vocational profile could perform certain unskilled light occupations (price marker, postage machine operator, and photocopy machine operator) that offered a significant number of jobs in the national economy. R. 33–34 (citing R. 55–56). Accordingly, ALJ Rippel concluded that Katie was not disabled during the relevant period. R. 34. The Appeals Council denied Katie's request to review the ALJ's decision, R. 1–3, and this appeal followed.

## III. Discussion

Katie argues that ALJ Rippel's "light" RFC determination is legally flawed because he did not correctly apply 20 C.F.R. § 404.1520c to a medical opinion from consultative examiner Monica Bowler, P.A.-C. *See* Pl.'s Br. 8–14 (citing R. 31, 1416). This regulation required ALJ Rippel to articulate "how persuasive" he found Ms. Bowler's opinion, 20 C.F.R. § 404.1520c(b), and "to 'explain how he considered the supportability and consistency factors'" in making this "persuasiveness" finding, *Stephen R. v. O'Malley*, No. 21-2292, 2024 WL 3508155, at *4 (4th Cir. July 23, 2024) (brackets omitted) (quoting § 404.1520c(b)(2)). Katie's brief focuses on Ms. Bowler's opinion that Katie's physical impairments limited her to standing for "about 2" hours and walking for "less than 2" hours during an 8-hour workday. R. 1416. ALJ Rippel rejected this part of Ms. Bowler's medical opinion because it was "not supported by her own examination findings which document[ed] no more than paraspinal tenderness" in the context of "full motion

5

[in] the spine, negative straight leg raise testing, and normal strength and sensation of the lower extremities." R. 31 (citing R. 1413–15). He also found that Ms. Bowler's full RFC assessment, R. 1416–17, was "not consistent with the evidence as a whole," R. 31, which supported a finding that Katie could stand and/or walk for "up to 6 hours" during an eight-hour workday, R. 25. *See also* R. 30–31. Katie argues that the ALJ did not properly analyze whether Ms. Bowler's medical opinion was "consistent" with other relevant evidence in the record, as § 404.1520c expressly requires. Pl.'s Br. 10–13; 20 C.F.R. § 404.1520c(b)(2). She does not challenge his conclusion that Ms. Bowler's opinion was "not supported by" her essentially normal examination findings. *See* Pl.'s Br. 10–13.

A.     Legal Framework

A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite her MDIs and related symptoms or treatment. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 266, 230–31 (4th Cir. 2011), including objective medical evidence, medical opinions, and the claimant's own statements, 20 C.F.R. § 404.1545(a), (e). *See, e.g.*, *Patterson v. Comm'r of Soc. Sec. Admin*, 846 F.3d 656, 659 (4th Cir. 2017) ("This RFC assessment is a holistic and fact-specific evaluation" made after the ALJ "evaluate[s] 'all' relevant record evidence" (quoting 20 C.F.R. § 404.1520(e)). The Commissioner's regulations "specif[y] the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ's decision must identify each

6

impairment-related functional limitation that is supported by the record. *See Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC finding itself should incorporate all credibly established "restrictions caused by medical impairments and their related symptoms" that reduce the claimant's "capacity to do work-related physical and mental activities" for eight hours a day, five days a week. SSR 96-8p, 1996 WL 374184, at *1–2; *see Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015).

Second, the ALJ's decision must provide a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how he weighed any conflicting or inconsistent evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when he considered all the relevant evidence under the correct legal standards, *Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and his written decision builds "an accurate and logical bridge from that evidence to his conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (cleaned up), *superseded on other grounds as recognized in Rogers v. Kijakazi*, 62 F.4th 872 (4th Cir. 2023). *See Shinaberry v. Saul*, 952 F.3d 113, 123 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12.

"Medical opinions"—that is, "statement[s] from a medical source about what [the claimant] can still do despite" her MDIs and whether the claimant has "impairment-related limitations or restrictions" in meeting specific physical, mental, or environmental demands of work, 20 C.F.R. § 404.1513(a)(2)—can be critical to a proper RFC analysis. *See, e.g.*, *Oakes v. Kijakazi*, 70 F.4th 207, 212–15 (4th Cir. 2023). Section 404.1520c specifies that ALJs "will consider" all medical opinions in the claimant's record using certain persuasiveness factors[3] and

---

[3] These factors include: "(1) supportability; (2) consistency; (3) a physician's relationship with the claimant; (4) a physician's specialization; and (5) other factors, like the physician's familiarity with the

7

"will articulate" in their written decisions "how persuasive [they] find" each source's medical opinion to be. 20 C.F.R. § 404.1520c(a)–(b).

This "regulation requires an ALJ to 'explain how he considered the supportability and consistency factors for a medical source's medical opinions.'" *Stephen R.*, 2024 WL 3508155, at *4 (brackets omitted) (quoting § 404.1520c(b)(2)); *see also Hale v. O'Malley*, No. 22-1902, 2023 WL 11907035, at *2 (4th Cir. Aug. 22, 2024). Supportability and consistency are distinct legal concepts. *See Stephen R.*, 2024 WL 3508155. "Supportability" requires ALJs to consider "the objective medical evidence and . . . explanations *presented by* [the] medical source . . . to support his or her [own] medical opinion(s)." 20 C.F.R. § 404.1520c(c)(1) (emphasis added); *see Oakes*, 70 F.4th at 212. "Consistency" requires ALJs to compare that source's medical opinions to "evidence *from other* medical and nonmedical sources" in the claimant's record. 20 C.F.R. § 404.1520c(c)(2) (emphasis added); *see Oakes*, 70 F.4th at 212. ALJs must adequately "explain" how they considered *both* supportability *and* consistency for each source's medical opinion in determining how "persuasive" they found the opinion to be. *Stephen R.*, 2024 WL 3508155, at *4 ("Although the ALJ invoked these factors, his analysis was threadbare and lacked citations. . . . Nowhere did he reference or describe to what evidence he was referring."). As always, the ALJ's decision must build an accurate and "logical bridge between the evidence and the ALJ's conclusion that [a medical] opinion," *Oakes*, 70 F.4th at 214, is or is not "persuasive" evidence of the claimant's allegedly disabling medical condition. *See Stephen R.*, 2024 WL 3508155, at *4. The ALJ must also give valid reasons for rejecting medical opinions that are more restrictive than his own RFC findings. *See id.* at *5.

---

evidentiary record" and the standard for determining disability. *See Oakes*, 70 F.4th at 212 (citing 20 C.F.R. § 404.1520c(c)(1)–(5)).

8

    B.    *Summary*

        1.    *Treatment Records*

On April 16, 2019, Katie saw Pamela Briggs, Pharm.D., for "chronic semi-stable" pelvic pain. R. 619–21. Katie described the pain as throbbing and "comparable to a knife cutting through her flesh." R. 619. The pain was "constant with periods of exacerbation that [we]re extreme." *Id.* Because of the pain, she was unable "to work and hold down a steady job." *Id.* Her worst pain in the last day had been "6/10," her least pain was "2/10," and her average pain was "5/10." *Id.* Her "average pain level at its worst during the past month was 5." *Id.* Her pain interfered with her "[g]eneral activity," "[w]alking ability," and "[n]ormal work" at a level of "5/10." *Id.* Walking, lifting, and bending exacerbated her pain while stretching, wedging a pillow under her legs, and taking baths eased it. R. 620. She noted that her "current medication regimen" provided "very good" pain relief "when needed" as it "t[ook] off the edge." *Id.* Dr. Briggs noted that Katie's "chronic pelvic pain ha[d] been an ongoing issue for over 5 years." R. 621. She also noted that Katie having her gall bladder removed "did not improve" the pelvic pain and that Katie was "still unable to hold down steady employment . . . because of her pain." *Id.*

On May 21, Katie followed up with Virginia Baker, D.O. R. 601–04. The pathology report from the procedure showed "estrogenic stimulation, no atypia." R. 604. On examination, Katie's BMI was 42.83. *Id.* Her abdomen was not tender or distended and had no masses. *Id.* She had a full range of motion in her extremities and normal gait. *Id.* Katie saw Stacey Cash, M.A., on August 9. R. 598–99. Katie reported burning back pain "mainly" in the lumbar area. R. 598. She had "[n]o recent injury," and taking baclofen was "not helpful." *Id.* She had been experiencing "[m]ore severe pelvic pain . . . for about 2 weeks." *Id.*

On November 14, Katie visited Roland Lee, M.D. R. 485. Katie reported that for two weeks, she had been experiencing sharp, "mid-sternal chest pain" that "c[ould] last a few seconds or up to 1 hour." *Id.* She also complained of "severe upper back pain." *Id.* The pain was sharp "and different [from] her usual chronic back pain" and radiated "into the low back." *Id.* She had "[n]o recent injury," and the back pain did not "coincide with the chest pain." *Id.* On examination, she was obese, had chest and back pain, and was "nervous/anxious." R. 486. At the ER, her abdomen was not tender. R. 775. Her BMI was 41, R. 774, indicating that she had "[c]lass 3 severe obesity," R. 787.

On January 31, 2020, Katie went to the ER because she had experienced "diffuse thoracic and lower back pain, bilateral hip pain, and bilateral rib pain with associated nausea" for two days. R. 759–61. She had not fallen or gotten injured. R. 763. She described the pain "as a constant pressure sensation that increase[d] with movements." *Id.* ER providers noted that Katie had "a history of back pain and ha[d] been taking ibuprofen and baclofen at home." *Id.* On examination, Katie had "[f]ree range of motion" in her extremities and no cyanosis or edema. R. 765. She had "[d]iffuse tenderness to palpation across the thoracic and lumbar region." *Id.* She was "more tender to palpation of her bilateral paraspinal musculature than throughout the middle areas of the thoracic and lumbar regions." *Id.* She had no step-offs, deformities, ecchymosis, erythema, or other skin changes. *Id.* She had 2+ patellar reflexes, "5-5 strength" in her lower extremities, and symmetric and grossly intact sensation to light touch bilaterally in her lower extremities. *Id.* ER providers recommended that she follow-up with her primary care provider and discharged her. R. 765–66.

On February 4, 2021, X-rays were taken of Katie's lumbar spine. R. 1352. The images showed normal vertebral body heights and soft tissues and no anterolisthesis. *Id.* They also

10

showed "[d]isc space narrowing" at L1-L2, L2-L3, and L4-L5; facet arthropathy at L4-L5 and L5-S1; and a "pars defect at L5." *Id.* Emily Ritchie, M.D., concluded that Katie had "[m]ild degenerative changes of the lumbar spine" and "L5 spondylolysis." *Id.*

Katie saw Ms. Bowler on June 26, 2021, for a consultative physical examination. R. 1411. Katie reported that she had been experiencing sharp pain in her back for six years. *Id.* The pain was "mainly in the lower back, but c[ould] go up her entire back into her shoulders." *Id.* "Lifting, standing for long periods, or sitting for long periods" exacerbated the pain and "[n]othing ma[de] the pain better." *Id.* She took baclofen for back pain, but it "d[id] not help much." *Id.* She also reported that she "ha[d] a history of pelvic pain for 7 years." *Id.* The "pain started when she had her first ovarian cyst due to her PCOS." *Id.* The pain was sharp and burning and could be "constant" or "on and off." *Id.* "Nothing made the pain worse or better." *Id.* Nevertheless, she was "not currently taking anything for her pelvic pain and ha[d] not recently seen an OBGYN." *Id.* She reported that she needed assistance to dress, clean, do dishes, and vacuum because of her back and pelvic pain. *Id.*

On examination, Katie was five feet, eight inches tall and weighed 301 pounds. R. 1413. She sat "comfortably" and was able to "rise from [a] waiting room chair independently" and "take off [her] shoes and socks without assistance." *Id.* She had normal base of support and non-antalgic gait, and she did "not walk with an assistive device." R. 1414. She was able to walk in tandem gait and on her toes and heels. *Id.* Her standing and "Romberg" were "intact." *Id.* She had 5/5 strength and normal range of motion throughout. R. 1414–15. The joints in her shoulders, knees, and ankles had "[n]o deformity, tenderness[,] or swelling." R. 1415. Her spine had normal curvature and "[n]o trigger points," and her straight leg raise test was negative bilaterally. *Id.* However, she endorsed "pain to palpation" in the lower left and right quadrants of

11

her abdomen, R. 1413, and bilateral "[p]araspinal muscle tenderness," R. 1415. Ms. Bowler diagnosed Katie with "[c]hronic lower back pain" and PCOS, among other conditions. R. 1416.

On July 27, Katie saw Dr. Lee "to follow[ ]up on her chronic conditions," including her obesity. R. 1442–45. Katie reported that she had "lost 14 pounds," was "doing a keto diet," and was "working hard to try to lose weight in order to feel better and help gain better control over her diabetes." R. 1442. On examination, she had "[n]ormal range of motion." R. 1444. Dr. Lee assessed Katie with "[c]lass 3 severe obesity" with a BMI "of 40.0 to 44.9." *Id.* Katie had a follow-up appointment for her obstructive sleep apnea with Nurse McNeal on September 10. R. 1677–79. Katie reported that she was "using and benefiting from PAP therapy." R. 1677. On examination, she weighed 294 pounds, had a BMI of 43.4, was ambulatory, and had a pain score of zero. R. 1678.

    2.    *Medical Opinions*

Jack Hutcheson Jr., M.D., reviewed Katie's records to determine her physical RFC for DDS's initial review in July 2021. R. 93–94. He opined that Katie could occasionally "lift and/or carry" fifty pounds and frequently "lift and/or carry" twenty-five pounds. R. 93. Her abilities to "[p]ush and/or pull" were "[u]nlimited, other than lift and/or carry." *Id.* She could sit and "[s]tand and/or walk" for "[a]bout 6 hours in an 8[-]hour workday." *Id.* She could frequently balance, stoop, kneel, crouch, crawl, and climb ramps or stairs and occasionally climb ladders, ropes, or scaffolds. *Id.* Regarding the proposed postural limitations, he explained that Katie had a history "of chronic pain and morbid obesity." *Id.* Dr. Hutcheson further opined that Katie should "[a]void [c]oncentrated [e]xposure" to hazards because of her "morbid obesity." R. 94. He briefly summarized Katie's medical history and determined that "[g]iven the evidence in the file, [she] would be limited to a [m]edium RFC with postural and environmental limitations." *Id.*

12

On June 26, 2021, Ms. Bowler completed a medical consultant report based on Katie's reported history, medical records from one ER visit in January 2020, and "today's physical exam" findings, R. 1416. *See* R. 1411–17. Ms. Bowler opined that Katie could occasionally lift or carry up to 100 pounds. R. 1416. She could sit for about six hours, stand for about two hours, and walk for less than two hours in an eight-hour workday. *Id.* She could frequently reach, handle, feel, and grasp. *Id.* She could occasionally bend, stoop, kneel, or squat. *Id.* She had no visual or communication limitations and did not need an assistive device to ambulate. R. 1417.

In December 2021, Bert Spetzler, M.D., reviewed Katie's medical records to determine her physical RFC for DDS's reconsideration review. R. 104–05. He adopted Dr. Hutcheson's initial physical RFC, but he determined that Katie could occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs. R. 105. He explained that her abilities to do these activities were "[l]imited due to morbid obesity diagnosis." *Id.* He also determined that Katie did not have environmental limitations. *Id.* He recommended a medium RFC. *Id.*

3.   *Katie's Statements*

Katie completed an Adult Function Report on November 19, 2020, as part of this DIB claim. R. 296–303. Her PCOS "stops [her] from walking and bending." R. 296. Her "PCOS and back issues" affect her abilities to squat, bend, sit, stand, and walk. R. 301. Her back issues also affect her abilities to kneel and climb stairs. *Id.* Because of her impairments, she sometimes needs help dressing and bathing her "lower half." R. 297. She can walk for two minutes before needing to stop and rest for eight to ten minutes. R. 301.

On a typical day, Katie takes her dogs outside, makes "something easy to eat," and "sit[s] or lay[s] down depending on how [she] feel[s]." R. 297. She takes care of her dogs by feeding them, giving them water, and taking them outside. *Id.* She walks the dogs twice a day for three

13

minutes. R. 298. Sometimes she "can't take [the dogs] out" because she is physically unable to do so. *Id.* Her husband "helps with [their] pets." R. 297. She goes outside twice a day and travels by driving or riding in a car. R. 299. She goes grocery shopping once a week for "one to two hours." *Id.* She enjoys "reading, TV, video games, sewing, [and] [k]nitting" and does these activities "almost every[ ]day." R. 300. She spends time with others in person, on the phone, and via text message, and they "talk, play games, eat, [and] drink." *Id.* She does these activities infrequently. *Id.* She is "90% less social now from [her] anxiety and [her] pain." *Id.*

On December 6, 2022, Katie testified at the administrative hearing. R. 44–54. She testified that she weighs 279 pounds and is five feet, nine inches tall. R. 44. She has "burning, sharp, intense" back pain that "comes and goes." R. 48–49. When the pain "is there," it increases when she "move[s] . . . certain way[s]," including bending and "[t]urning sideways." *Id.*

Katie also has PCOS, which causes intermittent pain. R. 49. When she experiences symptoms, she "can[] hardly walk ten steps" because "that's how much pain [she is] in." *Id.* She "sometimes . . . will have to have help with showers and dressing [her]self." *Id.* On average, she experiences this pain "four or five times a week." *Id.* When the pain occurs, "[i]t can last all day" or "last 20 minutes." R. 50. On average, it lasts for a "[c]ouple hours, like, three." *Id.* During that time, she lays "in bed, curled up in a ball," and "can't move." *Id.*

On an average day, Katie can stand for "20 minutes" before needing a break. R. 51. She can walk "[h]alf a mile, maybe," before needing to rest. R. 51–52. She can sit for "20 minutes" before needing to change positions. R. 52. Usually, she takes her husband to work, "take[s] [her] dogs out" twice, watches television, sleeps, reads a book, tries "to do some hobby to get [her] mind off of things," and "pick[s] [her] husband up from work." R. 53. She "hasn't cleaned in

14

years because [she] sometimes get[s] irritated when [she is] doing house chores with [her] PCOS and [her] pain." R. 52. She cannot do laundry because she cannot "lift it and walk with it." R. 53.

C.   *The ALJ's Decision*

ALJ Rippel found that Katie's lumbar degenerative disc disease and morbid obesity were severe MDIs during the relevant time. R. 20. Then, he analyzed her physical RFC. R. 25–32. He summarized certain aspects of the record, including Katie's written statements and hearing testimony and some of the objective and other medical evidence in the record. R. 26–30.

ALJ Rippel then evaluated the medical-opinion evidence in the record. *See* R. 30–31. He found that Dr. Hutcheson and Dr. Spetzler's opinions were "generally persuasive" because they were "supported by an explanation of the evidence available to them at the time the opinions were rendered." R. 30. However, Dr. Spetzler's opinion was "more persuasive as his limitations for postural maneuvers [were] more consistent with [Katie]'s lumbar spine disorder and obese status." *Id.* Dr. Hutcheson's opinion with respect to hazard exposure was "more in line with [Katie's] spine impairment in addition to her obesity, as [wa]s restricting her exposure to vibrations." R. 30–31. The ALJ determined "that both doctors understate[d] [Katie]'s spine disorder and respiratory impairments. R. 31.

ALJ Rippel found that Ms. Bowler's opinion was "of little persuasion." *Id.* He explained that although Ms. Bowler "supported her opinion by providing a narrative report documenting her physical exam findings, her opinion [wa]s somewhat vague and [wa]s not consistent with the evidence as a whole." *Id.* For example, Ms. Bowler's opinion that Katie "can only occasionally lift/carry 0–100 pounds" was "vague" and "inconsistent with her own normal examination findings" and "evidence of some" lumbar spine degenerative changes. *Id.* He also determined that the proposed two-hour limitations on standing/walking were "not supported by her own

15

examination findings." *Id.* He noted that on examination, Ms. Bowler found "no more than paraspinal tenderness" and observed "full motion of the spine, negative straight leg raise testing, and normal strength and sensation of the lower extremities." *Id.* He did not specifically reference her findings related to Katie's PCOS and obesity, *see id.*, but his summary of her report did include the finding that Katie weighed 301 pounds on exam, R. 27.

*D.    Discussion*

While ALJ Rippel's specific analysis of Ms. Bowler's medical opinion could have been more thorough, R. 31, his decision as a whole demonstrates that he "properly considered the supportability and consistency" of her opinion "alongside other evidence in the record," *Hale*, 2023 WL 11907035, at *2 (citing 20 C.F.R. § 404.1520c(c)). ALJ Rippel found that Ms. Bowler's opinion was "of little persuasion." R. 31. On supportability, he explained that although she "supported her opinion by providing a narrative report documenting her physical exam findings," the proposed "limitations for standing and walking" were "not supported by her own examination findings." *Id.* He reasoned that on examination, Ms. Bowler found "full motion of the spine, negative straight leg raise testing, . . . normal strength and sensation of the lower extremities," and "no more than paraspinal tenderness." *Id.* (citing R. 1415). The supportability factor examines the "objective medical evidence and supporting explanations presented by a medical source . . . to support his or her [own] medical opinion[]." 20 C.F.R. § 404.1520c(c)(1). The "more relevant" the evidence and explanations a medical source presents "to support his or her medical opinion[]" are, "the more persuasive" that opinion will be. *See id.* The ALJ's characterization of Ms. Bowler's examination findings is largely accurate, though he omitted that Katie endorsed right and left lower quadrant abdominal "pain to palpation," *see* R. 1413–15. *See* R. 25–31. Thus, the ALJ's conclusion regarding the supportability factor—which Katie does not

16

challenge—is supported by substantial evidence. *See Cameron R.S. v. Comm'r of Soc. Sec.*, No. 4:21cv116, 2022 WL 19350585, at *8 (E.D. Va. June 13, 2022), *report and recommendation adopted*, 2023 WL 2746026 (E.D. Va. Mar. 31, 2023).

On the consistency factor, "[t]he more consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] . . . will be." 20 C.F.R. § 404.1520c(c)(2). ALJ Rippel found that Ms. Bowler's opinion was "not consistent with the evidence as a whole," including her own essentially normal findings on exam. R. 31. He noted that Ms. Bowler's examination found "full range of motion of the spine, negative straight leg raise testing, . . . normal strength and sensation of the lower extremities," and "no more than paraspinal tenderness." *Id.* These findings are relevant to the "consistency" of Ms. Bowler's opinion with other evidence in the record. *See, e.g.*, *William O. v. O'Malley*, No. 3:23cv210, 2024 WL 1376483, at *4–7 (E.D. Va. Mar. 29, 2024) (concluding that ALJ's consistency analysis was sufficient where it was based in part on ALJ's reasoning that a medical opinion was inconsistent with the source's own treatment notes). He also credited Dr. Hutcheson and Dr. Spetzler's opinions that Katie was able to sit and stand and/or walk for about six hours in an eight-hour workday notwithstanding her chronic pain and severe "morbid obesity," R. 30 (citing R. 93–94, 104), which conflicts with Ms. Bowler's opinion that Katie was limited to two hours of standing and fewer than two hours of walking during an eight-hour day. Katie does not challenge the ALJ's assessment of Dr. Hutcheson and Dr. Spetzler's medical opinions. *See* Pl.'s Br. 8–14. Because ALJ Rippel adequately examined the supportability and consistency factors, his conclusion that Ms. Bowler's opinion was "of little persuasion," R. 31, is both legally adequate and supported by substantial evidence in the record. *See Hale*, 2023 WL 11907035, at *2. Accordingly, the Court does not address Katie's

17

other argument concerning the VE's jobs-numbers testimony based on a hypothetical sedentary RFC. *See* Pl.'s Br. 13–14.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **AFFIRM** the Commissioner's final decision that Katie was not disabled during the relevant time.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall serve certified copies of this Report and Recommendation on all counsel of record.

ENTER: August 30, 2024

Joel C. Hoppe
United States Magistrate Judge